1
2
3
4
# UNITED STATES DISTRICT COURT

5
## EASTERN DISTRICT OF CALIFORNIA

6

7   LINDEN GRAHAM,                          1:03-cv-06353-AWI-GSA-PC

8              Plaintiff,                    FINDINGS AND RECOMMENDATIONS
                                            RECOMMENDING THAT DEFENDANTS'
9        v.                                  MOTION FOR SUMMARY JUDGMENT BE
                                            GRANTED
10  J. BAUGHMAN, M.D. and
    C. REESE,                                (Doc. 89.)
11
               Defendants.                   OBJECTIONS, IF ANY, DUE IN 30 DAYS
12
                                  /
13

14        Linden Graham ("Plaintiff") is a former state prisoner proceeding pro se and in forma

15  pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.[1]  Now pending before the

16  court is defendants' motion for summary judgment.

17  **I.       RELEVANT PROCEDURAL HISTORY**

18        This action is proceeding on Plaintiff's second amended complaint, filed November 14,

19  2005, on Plaintiff's claims for violation of due process against defendant C. Reece (Counselor),

20  and for violation of rights to adequate medical care under the Eighth Amendment against

21  defendant J. Baughman, M.D.[2]  (Doc. 22.)[3]

22

23        [1]Plaintiff now resides in Kingston, Jamaica.

24        [2]Plaintiff varies the spelling of defendant Baughman's last name as Baughman, Braugham, and Brougham.

25        [3]Plaintiff's original complaint, filed October 1, 2003, named defendants Warden Sullivan, Dr. Braugham,
    and C. Reece.  (Doc. 1.)  Plaintiff's first amended complaint, filed May 11, 2004, named defendants Associate
26  Warden (A.W.) K.E. Todd, A.W. B. Carey, CCI Reece, C/O R. Thomas, Warden L. Blanks, W. Tesauro, CCII M.
    Vela, A. Lopez, E. Guerrero, V. McLaughlin, A. Quinones, Dr. Brougham, and Lieutenant D. Morelli.  (Doc. 14.)
27  Plaintiff's second amended complaint named only two defendants, C. Reece and Dr. J. Baughman.  (Doc. 22.)  The
    court screened the second amended complaint pursuant to 28 U.S.C. § 1915A and on November 18, 2005 found it
28  only states cognizable claims against Dr. Baughman for violation of the Eighth Amendment and against C. Reece for
    violation of due process.  (Doc. 23.)

On September 25, 2009, defendants C. Reece and J. Baughman ("Defendants") filed a motion for summary judgment. (Docs. 89-91.)   On October 6, 2009, Plaintiff filed a response in opposition to the motion for summary judgment.[4] (Doc. 92.)  On October 19, 2009, Defendants filed a reply to the opposition.  (Doc. 93.)  Defendants' motion is now before the court.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Fed.R.Civ.P. 56(e); Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 n.11 (1986);

---

[4] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on February 8, 2006.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 26.)

First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289 (1968);  Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed.R.Civ.P. 56(e);  Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law,  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party,  Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief.  McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985); Fed.R.Civ.P. 56(e).  Plaintiff's complaint is verified and will be considered by the court in resolving Defendants' motion to the extent that it sets forth admissible facts.  The parties bear the burden of supporting their motions and oppositions with the papers they wish the court to consider and/or by specifically referring to any other portions of the record they wish the court to consider.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The court will not undertake to mine the record for triable issues of fact.  Id.

## III.   PLAINTIFF'S ALLEGATIONS

### A.   Allegations Against Defendant Reece in Second Amended Complaint

On April 6, 2002, when Plaintiff was incarcerated at California Mens Colony-West ("CMC"), he was found guilty of a CDC-115 offense and sentenced to a term in the Security Housing Unit ("SHU"), based on false information.  Plaintiff appealed the decision and on May 15, 2002, the appeal was granted and his sentence was reduced.  Plaintiff wrote three times to his counselor, C. Reece, to be reclassified to reflect the reduced sentence, providing Reece with a

1   copy of the CDC-128G form he received on May 16, 2002.  Reece ignored his request.  Without

2   his counselor's authorization to take him and have him reclassified, Plaintiff would remain in the

3   SHU until the original sentence was finished.  On June 5, 2002, Plaintiff was transferred to a

4   maximum SHU at California Correctional Institution ("CCI") in Tehachapi, California, on a

5   Level IV yard.

6   **B.      Allegations Against Defendant Baughman in Second Amended Complaint**

7           On June 5, 2002, Plaintiff was transferred to CCI.  When he arrived at CCI, he informed a

8   nurse that he has hypertension, and his hypertension patch needed changing.  The nurse said she

9   would call the doctor, and she checked Plaintiff's blood pressure, which was 140/88.  Half an

10  hour later, the nurse returned and told Plaintiff the doctor said to give her the patch, which

11  Plaintiff did.  That night, Plaintiff developed a headache which became so unbearable over the

12  next two days that Plaintiff was crying and praying the pain would stop.  Plaintiff complained to

13  every correctional officer who passed by his cell.  On June 7, 2002, a male nurse came to his cell,

14  asked about the headache, and checked Plaintiff's blood pressure, which was 200/140.  The male

15  nurse told Plaintiff the doctor ordered them not to give Plaintiff any medications.

16          On June 8, 2002, another nurse came and gave Plaintiff fourteen Terzosin tablets,[5] which

17  did not stop the headache or help lower Plaintiff's hypertension.

18          On June 10 or 11, 2002, Plaintiff saw Dr. Baughman and asked Dr. Baughman why he

19  refused to give him his medications.  Dr. Baughman said he did not believe in Clonidine patches

20  or pills, that Plaintiff would not receive them as long as he was housed at CCI, and Sacramento

21  had stopped authorizing Clonidine patches and pills.  Plaintiff told Dr. Baughman that Dr.

22  Viggilenta, a medical specialist at CMC, had controlled his hypertension with Clonidine patches

23  and one Terzosin tablet a day.  Dr. Viggilenta had warned Plaintiff that the prescribed

24  medications could be harmful to his kidneys.  Dr. Baughman said he was aware of Plaintiff's

25  hypertension history.  Plaintiff asked Dr. Baughman to refer him to another medical facility, but

26  Dr. Baughman said he could not do anything for Plaintiff.  Two days later, Plaintiff was issued

27

28          [5]According to both parties, Terazosin or Terzosin is a medication used for high blood pressure.

4

1  fourteen Terzosin tablets, the same medications harmful to his kidneys, and his blood pressure

2  still remained out of control.

3      In July 2002, after showering, Plaintiff developed a rash all over his body, and a vein in

4  his loins burst.  Two male correctional officers found Plaintiff's bloody boxer shorts, and

5  Plaintiff explained that his vein burst because of uncontrolled high blood pressure.

6      Plaintiff filed appeals against Dr. Baughman for disregarding Plaintiff's head pain, rashes,

7  and burst vein.  Dr. Baughman denied Plaintiff's appeal at each level.  Plaintiff contends that Dr.

8  Baughman deliberately violated CDC rule, Title 15 § 3084.5-c, which states that formal appeals

9  shall not be reviewed by a staff person who participated in the event or decision being appealed,

10 who is of lower administrative rank than participating staff, or who participates in review of a

11 lower level appeal refiled at a higher level.

12 **IV.   UNDISPUTED FACTS**[6]

13     **A.   <u>Background Facts</u>**

14         1.    Between 2000 and October 2003, Linden Graham was an inmate in the

15             custody of the California Department of Corrections and Rehabilitation

16             (CDCR).

17         2.    From 2001 to June 4, 2002, Graham was incarcerated at the California

18             Men's Colony (CMC) in San Luis Obispo, California.

19         3.    From June 5, 2002 to October 2003, Graham was incarcerated at the

20             California Correctional Institution (CCI) in Tehachapi, California.

21         4.    Graham paroled in October 2003.

22         5.    Graham currently lives in Jamaica.

23 ///

24

25 [6]These facts are undisputed for the sole purpose of this motion.  Plaintiff has not filed a separate statement of disputed facts nor admitted or denied the facts set forth by defendants as undisputed.  Local Rule 56-260(b).

26 However, within his opposition document, Plaintiff filed a list of "Substantial Facts" in which he states facts upon which he bases his claim.  Plaintiff's complaint and opposition are verified and shall be treated as affidavits for

27 purposes of the summary judgment rule where they are based on facts within Plaintiff's personal knowledge of admissible evidence, and not merely on Plaintiff's belief.  <u>Johnson v. Meltzer</u>, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); <u>McElyea</u>, 833 F.2d at 197-98; <u>Lew</u>, 754 F.2d at 1423; Fed.R.Civ.P. 56(e).

28

**B.** **Facts Regarding Plaintiff's Claim Against Defendant Reece**

6. At all times relevant to this action, Reece was a correctional counselor at CMC.

7. On March 5, 2002, Graham was charged with possession of a weapon.

8. On April 6, 2002, Graham was found guilty of "possession of a weapon," was assessed a SHU term, and lost 360 days of work time credits.

9. CDCR has designed special housing units for the programming of inmates who are not suited for general population.

10. SHU is a form of disciplinary segregation.

11. The California Code of Regulations requires that a classification staff representative (CSR) must approve both an inmate's placement and release from SHU.

12. Reece was not a CSR at CMC or CCI.

13. CMC does not have a SHU.

14. CCI has a SHU.

15. On April 10, 2002, Graham filed a grievance, with assigned log number 02-1211, claiming that the charges against him should be dropped.

16. On May 2, 2002, D.P. Carey, B. Curry, G. Freitas, L. Lawrence, and Doctor Schwab ordered that Graham should be transferred to either CCI or California State Prison Corcoran to serve his SHU term.

17. On May 14, 2002, a CSR at CMC approved Graham's transfer to CCI.

18. On May 15, 2002, D.P. Carey and L. Blanks granted grievance number 02-1211.

19. Graham's commitment offense was reduced to "possession of altered material which can be made into a weapon."

20. Graham's offense was reduced from a division A to a division C offense.

21. Also 240 of Graham's credits were restored.

///

22.   On May 16, 2002, D.P. Carey prepared a chrono which indicated that: (1) grievance 02-1211 was granted; (2) Graham's commitment offense was reduced from division A to division C; (3) Graham's loss of credits was reduced from 360 to 120; and (4) Graham should be referred to a classification committee concerning his program status and to order any necessary changes.

23.   According to Carey's chrono, a copy of the chrono was provided to Graham.

24.   According to Carey's chrono, the original copy of Carey's chrono was placed in Graham's central file.

25.   Sometime between May 16 and June 5, 2002, Graham attempted to contact Reece to schedule a classification committee meeting, hoping the classification committee would release him from the SHU.

26.   On June 11, 2002, Graham was scheduled for a classification committee to determine whether he should remain in the SHU at CCI.

27.   On June 13, 2002, Graham attended a classification committee hearing at CCI to assess Graham's SHU status.

28.   Graham's central file was at the hearing.

29.   The committee elected to keep Graham in the SHU.

30.   On September 11, 2002, a CSR at CCI vacated Graham's SHU term.

**C.**   **Facts Regarding Plaintiff's Claim Against Defendant Baughman**

31.   At all times relevant to this suit, Baughman was a licensed medical doctor at CCI.

32.   Clonidine is one of several medications prescribed to control a patient's blood pressure.

33.   Baughman prescribed his patients blood pressure medications other than Clonidine.

///

34.    Prior to arriving at CCI, Graham was prescribed a daily dose of Terazosin and a weekly Clonidine patch for his high blood pressure.

35.    Baughman played no role in Graham's treatment before June 5, 2002.

36.    Baughman did not examine Graham on June 5, 2002.

37.    When Graham was examined at 5:15 p.m. on June 5, 2002, his blood pressure was 140/88.

38.    On the evening on June 5, 2002, Baughman was informed that Graham: (1) was wearing a Clonidine patch; and (2) Graham's blood pressure was stable.

39.    Baughman decided to change Graham's blood pressure medications.

40.    At approximately 8 p.m. June 5, 2002, Baughman ordered that Graham should not receive any medication during the evening of June 5, 2002.

41.    According to plaintiff's medical records, Baughman ordered that Graham would be examined by a doctor and his blood pressure would be checked on the morning of June 6, 2002.

42.    On June 7, 2002, Baughman examined Graham.

43.    Baughman ordered that Graham's prescription for Clonidine would be replaced with other medications.

44.    During his examination, Graham expressed concern that a new blood pressure medication would damage his kidneys.

45.    On June 8, 2002, Graham began to receive his new prescribed medications.

## V.   ANALYSIS

### A.   Section 1983 Actions

The Civil Rights Act under which this action was filed provides:

Every person who, under color of [state law]. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution. . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  42 U.S.C. § 1983.

///

8

1   "Section 1983 . . .  creates a cause of action for violations of the federal Constitution and

2   laws." Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (internal quotations

3   omitted).  "To the extent that the violation of a state law amounts to the deprivation of a state-

4   created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983

5   offers no redress." Id.

6       The statute plainly requires that there be an actual connection or link between the actions

7   of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v.

8   Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  The

9   Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional

10  right, within the meaning of section 1983, if he does an affirmative act, participates in another's

11  affirmative acts or omits to perform an act which he is legally required to do that causes the

12  deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

13      **B.      Claims Against Defendant Baughman**

14           **1.      Medical Claim**

15      Plaintiff claims that Defendant Dr. Baughman was deliberately indifferent to his serious

16  medical needs when he changed Plaintiff's blood pressure medication, causing Plaintiff to suffer

17  from headaches, elevated blood pressure, rashes, and a burst vein.

18           **a.      Legal Standard**

19      "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

20  must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091,

21  1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)).  The two

22  part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by

23  demonstrating that 'failure to treat a prisoner's condition could result in further significant injury

24  or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need

25  was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050,

26  1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133,

27  1136 (9th Cir. 1997) (en banc) (internal quotations omitted)).  Deliberate indifference is shown by

28  "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm

caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060).  Deliberate indifference
may be manifested "when prison officials deny, delay or intentionally interfere with medical
treatment, or it may be shown by the way in which prison physicians provide medical care." Id.
In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's
civil rights have been abridged, "the indifference to his medical needs must be substantial.  Mere
'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."
Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at
105-06.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical
condition does not state a valid claim of medical mistreatment under the Eighth Amendment.
Medical malpractice does not become a constitutional violation merely because the victim is a
prisoner." Estelle, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th
Cir. 1995); McGuckin, 974 F.2d at 1050, WMX Techs., Inc., 104 F.3d at 1136.  Even gross
negligence is insufficient to establish deliberate indifference to serious medical needs.  See Wood
v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  A prisoner's mere disagreement with
diagnosis or treatment does not support a claim of deliberate indifference.  Sanchez v. Vild, 891
F.2d 240, 242 (9th Cir. 1989).

### b.   Defendant Baughman's Position

First, Defendant Dr. Baughman argues that Plaintiff has not provided evidence that the
medical treatment provided to him by Dr. Baughman was medically inappropriate.  Dr. Baughman
contends that Plaintiff has only given his own opinion, and he is not qualified to provide a
medical opinion.  (Amended Complaint ("ACP") at 3-4.)  Dr. Baughman contends that the most
Plaintiff could show is a difference of medical opinion, which under Sanchez cannot support a
claim of deliberate indifference to serious medical needs, id., and an inmate's personal
disagreement with prison officials about his need for a particular medical treatment cannot give
rise to a civil rights claim based upon deliberate indifference, Franklin v. State of Or., State
Welfare Division, 622 F.2d 1337, 1344 (9th Cir. 1981).

Second, Defendant Dr. Baughman argues that he did not withhold Plaintiff's blood
pressure medication for several days.  Dr. Baughman declares that after 8:00 p.m. on June 5,

1  2002, he ordered that (1) Plaintiff should not receive any medications that evening, (UF 40; Doc.

2  91, Baughman Dec., ¶¶4, 6, Exh. C p. 1; ACP at 4.), to prevent Plaintiff from experiencing

3  adverse drug interactions; and (2) Plaintiff would be examined the morning of June 6, 2002, to

4  restart his medications.  (Doc. 91, Baughman Dec., ¶¶4, 6, Exh. C p. 1.)  Dr. Baughman claims he

5  did not believe, or have any reason to believe, that Plaintiff would be unable to see a doctor, and

6  Dr. Close renewed Plaintiff's prescription for Terazosin on June 6, 2002.  (Baughman Dec., ¶8.)

7  Dr. Baughman declares that on June 7, 2002, he examined Plaintiff and replaced his prescription

8  for Clonidine with Amlodipine and Hydrocholorothiazide.  (Doc. 91, Baughman Dec. ¶¶10, 11,

9  Exh. C pp. 1-2.)  Dr. Baughman argues that at most, Plaintiff claims that after he prescribed

10  appropriate medication on June 7, 2002, non-defendants either failed to fill the prescription or

11  distribute it to Plaintiff.  Dr. Baughman denies that he was aware of anyone who refused to

12  comply with his orders.  (Doc. 91, Baughman Dec., ¶8.)

13       Finally, Defendant Dr. Baughman argues that Plaintiff was not harmed by the medication

14  he prescribed, and Plaintiff is not qualified to establish any of his alleged injuries were caused by

15  Dr. Baughman.  (UF 53-55, 60-61, 66-67.)  Dr. Baughman declares that because he was

16  concerned about the condition of Plaintiff's kidneys, he ordered urine tests to monitor the

17  condition of Plaintiff's kidneys.  (Doc. 91, Baughman Dec., ¶12.)  Dr. Baughman monitored the

18  results of those tests and found that Plaintiff's kidneys were not damaged by the medication that

19  he prescribed.  Id.

20       The court finds that Defendant Dr. Baughman has met his initial burden of informing the

21  court of the basis for his motion, and identifying those portions of the record which he believes

22  demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to

23  plaintiff to establish that a genuine issue as to any material fact actually does exist.  See

24  Matsushita, 475 U.S. at 586.  As stated above, in attempting to establish the existence of this

25  factual dispute, plaintiff may not rely upon the mere allegations or denials of his pleadings, but is

26  required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

27  material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at

28  586 n.11; First Nat'l Bank of Arizona, 391 U.S. at 289; Strong, 474 F.2d at 749.

1    "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060

2    (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of the facts from

3    which the inference could be drawn that a substantial risk of serious harm exists,' but that person

4    'must also draw the inference.'" Id. at 1057 (quoting Farmer v. Brennan, 511 U.S. 825, 837

5    (1994)).  "'If a prison official should have been aware of the risk, but was not, then the official has

6    not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v.

7    County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

8        "A difference of opinion between a prisoner-patient and prison medical authorities

9    regarding treatment does not give rise to a § 1983 claim," Franklin, 662 F.2d at 1344, and a

10   difference of opinion between medical personnel regarding treatment does not amount to

11   deliberate indifference. Sanchez, 891 F.2d at 242.  An inmate's personal disagreement with

12   prison officials about his need for a particular medical treatment cannot give rise to a civil rights

13   claim based upon deliberate indifference. Franklin, 622 F.2d at 1344. To prevail, plaintiff must

14   set forth admissible evidence showing "that the course of treatment the doctors chose was

15   medically unacceptable under the circumstances . . . and . . . that they chose this course in

16   conscious disregard of an excessive risk to [his] health." Jackson v. McIntosh, 90 F.3d 330, 332

17   (9th Cir. 1986) (internal citations omitted).

18                                  **c.    Discussion**

19       Turning to Plaintiff's position, the court looks to Plaintiff's verified opposition and

20   verified second amended complaint.[7]  (Docs. 22, 92.)  The court will consider Plaintiff's medical

21   records to the extent that the records are clear and speak for themselves.  However, to the extent

22   that interpretation of the records by an expert is necessary, Plaintiff's lay opinions may not be

23   considered.

24   ///

25   ─────────────────

26       [7]Plaintiff signed under penalty of perjury at the bottom of the proof or service between the last page of his
     opposition and the attached exhibits.  (Opp'n, Doc. 92 at 12.)  The court accepts this entire document as a verified
27   opposition.  Also, a verified complaint in a pro se civil rights action may constitute an opposing affidavit for
     purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of
28   admissible evidence, and not merely on the inmate's belief.  McElyea, 833 F.2d at 197-98; Lew, 754 F.2d at 1423;
     Fed.R.Civ.P. 56(e).

1    The parties do not dispute that Plaintiff's hypertension constitutes a serious medical

2    condition of which Dr. Baughman was aware, or that Dr. Baughman treated Plaintiff and changed

3    his blood pressure medication after Plaintiff arrived at CCI on June 5, 2002.  However, Plaintiff

4    disputes Defendant's argument that he has not submitted evidence of Dr. Baughman's deliberate

5    indifference.  Plaintiff argues that Dr. Baughman knew his medical treatment would cause

6    Plaintiff to suffer side effects, but he disregarded the risk, proceeded with the treatment, and

7    refused to try other treatments, causing Plaintiff to suffer severe headaches, rashes, a burst vein,

8    and risk of heart attack.  Plaintiff claims that Dr. Baughman disregarded his "medical disease" and

9    fought against giving him the medication that kept him alive and kept him from having a heart

10   attack or stroke.

11    Plaintiff arrived at CCI on June 5, 2002, and informed a nurse that he suffered from

12   hypertension and his Clonidine patch needed to be changed.  (UF 3; ACP at 3; Opp'n at 3 ¶1.)

13   Clonidine is one of several medications prescribed to control a patient's blood pressure.  (UF 26.)

14   The nurse took his blood pressure, which was 140/88, and informed Dr. Baughman that Plaintiff

15   was wearing a Clonidine patch and his blood pressure was stable.  (UF 34, 35; ACP at 4:1-2;

16   Opp'n at 3 ¶1.)  Dr. Baughman decided to change Plaintiff's blood pressure medicine, took away

17   Plaintiff's patch, and ordered that he not receive any medication.  (UF 36-39; ACP at 4:3-4.)  That

18   night, Plaintiff developed a headache which continued over the next few days and became so

19   unbearably painful that Plaintiff stayed up crying and could not lie down without the pain

20   becoming worse.  (ACP at 4:5-7; Opp'n at 3 ¶2.)  Plaintiff complained to every correctional

21   officer who passed by his cell, cried and prayed the pain would go away.  (ACP at 4:7-8; Opp'n at

22   3 ¶2.)

23    On June 7, 2002, a male nurse came by Plaintiff's cell, Plaintiff complained about the

24   headache, and the nurse took Plaintiff's blood pressure which was 200/140.  (ACP at 4:9-11;

25   Opp'n at 3 ¶3, Exh. A.)  The nurse told Plaintiff that Dr. Baughman ordered them not to give him

26   any medications.  (ACP at 4:11-12; Opp'n at 4, Exh. B.)

27    On June 8, 2002, a female nurse came and gave Plaintiff fourteen Terzosin tablets, which

28   did not stop the headache or lower his hypertension.  (ACP at 4:13-14; Opp'n at 4 ¶4.)  On June

13

11 or 12, 2002, Plaintiff saw Dr. Baughman and asked him why he refused to give him his medications. (ACP at  4:15-16; Opp'n at 4 ¶5.)  Dr. Baughman told Plaintiff he did not believe in Clonidine patches or pills, and that Sacramento had stopped authorizing Clonidine pills and patches.  (UF 27-29; ACP at 16-19; Opp'n at 4 ¶5.)  Plaintiff explained to Dr. Baughman that Dr. Viggilenta, specialist at CMC, had controlled his hypertension with a Clonidine patch and one Terzosin tablet per day.  (ACP at 4:19-21; Opp'n at 4 ¶6.)  Plaintiff also mentioned to Dr. Baughman that Dr. Viggilenta advised Plaintiff that the medications were harmful to his kidneys. (UF 50; ACP at 4:21-23; Opp'n at 4 ¶5, Exh. C.)  Plaintiff asked Dr. Baughman for pain medication or referral to another medical facility, which Baughman declined.  (ACP at 4:24-26; Opp'n at 4 ¶7.)  Plaintiff was given more Terzosin and returned to his cell.  (Opp'n at 4 ¶7.)

On June 14, 2002, Plaintiff received medications which Dr. Baughman prescribed, which hurt his kidneys and did not control his blood pressure.  (ACP at 5:1-3.)  In July 2002, after showering, rashes began to cover Plaintiff's skin, and veins started to burst on his loins.  (ACP at 5:3-4; Opp'n at 5 ¶8.)  Two male correctional officers searched Plaintiff's cell one morning and found Plaintiff's bloody boxer shorts.  (ACP at 5:4-5; Opp'n at 5 ¶8.)  Plaintiff explained to them that the blood was from a burst vein caused by high blood pressure.  (ACP at 5:5-7; Opp'n at 5 ¶8.)

The court finds that Plaintiff has not set forth any admissible evidence that raises a triable issue of fact with respect to whether or not Defendant Dr. Baughman was deliberately indifferent to Plaintiff's serious medical needs.

First, Plaintiff has submitted no evidence that Dr. Baughman purposely withheld medication from him for several days.

Second, Plaintiff has submitted no evidence that Dr. Baughman disregarded a risk of serious harm to Plaintiff when he decided to change Plaintiff's medication from Clonidine to other medications.

Third, Plaintiff has submitted no evidence that Dr. Baughman's failure to try other medications or to refer him to another medical facility demonstrated that he "[knew] of and disregarded an excessive risk to [Plaintiff's] health."

1    Finally, Plaintiff has not submitted evidence that Dr. Baughman's treatment caused

2  Plaintiff to suffer any harm, including severe headaches, rashes, a burst vein, and risk of heart

3  attack or stroke.

4    The most that Plaintiff has shown is a difference of opinion between himself, a prisoner-

5  patient, and a prison medical authority regarding treatment, which does not give rise to a § 1983

6  claim." Franklin, 662 F.2d at 1344.  Nor can Plaintiff prevail on the argument that Dr. Baughman

7  was deliberately indifferent for changing his course of treatment from that prescribed by Dr.

8  Viggilenta, because he has not set forth admissible evidence showing "that the course of treatment

9  the doctor[] chose was medically unacceptable under the circumstances."  Plaintiff has submitted

10  no evidence that Defendant Dr. Baughman was aware of a risk of serious harm to Plaintiff caused

11  by his decision to change Plaintiff's medication, that he purposely disregarded such a risk, or that

12  Dr. Baughman's treatment was the cause of Plaintiff's symptoms.

13    On June 5, 2002, when Plaintiff arrived at CCI, his blood pressure was 140/88.  It is

14  undisputed that Dr. Baughman took away Plaintiff's Clonidine patch that day.  Plaintiff was then

15  without any medication for several days, but there is no evidence that Defendant meant him to be

16  without medication for more than one night.  Defendant has provided evidence that he expected

17  another physician to follow up on Plaintiff's treatment and check his blood pressure the next

18  morning.  (Doc. 91, Baughman Dec., ¶¶4, 6, 8, Exh. C p. 1.)

19    The issue here is whether the medical treatment provided to Plaintiff by Dr. Baughman

20  was medically inappropriate.  Plaintiff has not provided any evidence that Dr. Baughman chose to

21  change medications in contradiction to established medical practice.  Moreover, as a layman,

22  Plaintiff is not qualified to offer an opinion about whether Dr. Baughman should have tried other

23  medications or referred him to another medical facility.  There are no genuine issues as to any

24  material fact.  Therefore, Defendant Dr. Baughman is entitled to judgment as a matter of law.

25         **2.     Improper Grievance Process**

26    Plaintiff claims that defendant Dr. Baughman violated CDC rule, Title 15 § 3084.5-c,

27  when he participated in the review of Plaintiff's grievance against him.

28  ///

1                **a.**       **Legal Standard**

2        The existence of an administrative remedy process does not create any substantive rights

3 and therefore, neither the inadequacies of the prison grievance system nor the allegation that

4 Plaintiff's access to the grievance system is being obstructed or hindered state a claim for relief

5 under section 1983. Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003); Mann v. Adams, 855

6 F.2d 639, 640 (9th Cir. 1988); Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001).

7                **b.**       **Defendant Baughman's Position**

8        Defendant Dr. Baughman argues that Plaintiff's claim that he followed improper

9 procedures when reviewing Plaintiff's prison grievance is not actionable because there is no

10 entitlement to a grievance procedure, and Plaintiff cannot support a § 1983 claim on the ground

11 that Dr. Baughman failed to: (1) adequately process his grievance, or (2) resolve the grievances in

12 his favor.

13                **c.**       **Discussion**

14        In opposition, Plaintiff argues that he violated a CDC rule, Title 15 § 3084.5-c, when he

15 participated in the review of Plaintiff's grievance against him. (Opp'n, Doc. 92 at 5.) Plaintiff

16 states that Title 15 § 3084.5-c provides that formal appeals shall not be reviewed by a staff person

17 who participated in the event or decision being appealed, who is of lower administrative rank than

18 participating staff, or who participates in review of a lower level appeal refiled at a higher level.

19 (ACP, Doc. 22 at 5:15-20.) Plaintiff submits as evidence against Dr. Baughman a copy of the

20 Second Level Appeal Response to his appeal #CCI-7-02-02833 dated November 8, 2002, which

21 was denied by J. Baughman, M.D. on November 21, 2002. (Opp'n, Doc. 92, Exh D.)

22        There is simply no general constitutional right to an adequate or fair grievance system

23 upon which to premise such a claim in federal court. With regard to Plaintiff's claim that Dr.

24 Baughman violated a CDC rule, "[S]ection 1983 . . . creates a cause of action for violations of the

25 federal Constitution and laws," but "[T]o the extent that the violation of a state law amounts to the

26 deprivation of a state-created interest that reaches beyond that guaranteed by the federal

27 Constitution, Section 1983 offers no redress." Sweaney, 119 F.3d at 1391. Therefore, Defendant

28 ///

1  Dr. Baughman is entitled to judgment as a matter of law on Plaintiff's claim that he followed

2  improper procedure when deciding an appeal.

3  **3.    Qualified Immunity**

4  Defendant Dr. Baughman argues that he is entitled to qualified immunity.  Government

5  officials enjoy qualified immunity from civil damages unless their conduct violates "clearly

6  established statutory or constitutional rights of which a reasonable person would have known."

7  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).  Thus, if a constitutional

8  violation occurred, prison officials are entitled to qualified immunity if they acted reasonably

9  under the circumstances.  Millender v. County of Los Angeles, 564 F.3d 1143, 1148 (9th Cir.

10  2009).   "Qualified immunity balances two important interests - the need to hold public officials

11  accountable when they exercise power irresponsibly and the need to shield officials from

12  harassment, distraction, and liability when they perform their duties reasonably," Pearson v.

13  Callahan, 129 S.Ct. 808, 815 (2009), and protects "all but the plainly incompetent or those who

14  knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).

15  In resolving a claim of qualified immunity, courts must determine whether, taken in the

16  light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if

17  so, whether the right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151,

18  2156 (2001); McSherry v. City of Long Beach, 560 F.3d 1125, 1129-30 (9th Cir. 2009).  While

19  often beneficial to address in that order, courts have discretion to address the two-step inquiry in

20  the order they deem most suitable under the circumstances.  Pearson, 129 S.Ct. at 818 (overruling

21  holding in Saucier that the two-step inquiry must be conducted in that order, and the second step

22  is reached only if the court first finds a constitutional violation); McSherry, 560 F.3d at 1130.

23  Here, because the court finds that Dr. Baughman's conduct did not violate Plaintiff's

24  constitutional rights, the issue of qualified immunity need not be addressed.

25  **C.    Claims Against Defendant Reece**

26  Plaintiff brings a claim against defendant C. Reece (Correctional Counselor) for violation

27  of the Due Process Clause on the basis that Reece failed to respond to Plaintiff's requests for a

28  reclassification hearing.  Plaintiff alleges that as a result of Reece's inaction, Plaintiff was

wrongfully transferred to CCI and forced to serve a sentence in the SHU that he had successfully appealed.

### 1.   Due Process

The Due Process Clause protects against the deprivation of liberty without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  In order to invoke the protection of the Due Process Clause, a plaintiff must first establish the existence of a liberty interest for which the protection is sought.  Liberty interests may arise from the Due Process Clause itself or from state law.  Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005).

The Due Process Clause itself does not confer on inmates a liberty interest in avoiding "more adverse conditions of confinement."  Id. at 2393; Hewitt v. Helms, 459 U.S. 460, 466-68 (1983).  Under state law, the existence of a liberty interest created by prison regulations is determined by focusing on the nature of the deprivation.  Sandin v. Conner, 515 U.S. 472, 481-84 (1995).  The Sandin Court held that liberty interests created by prison regulations are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id. at 484.  Sandin requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner.  See Resnick v. Hayes, 213 F.3d 443, 448 (9th Cir. 2000); Duffy v. Riveland, 98 F.3d 447, 457 (9th Cir.1996); Keenan v. Hall, 83 F.3d 1083, 1088-89 (9th Cir.1996); Mitchell v. Dupnik, 75 F.3d 517, 522 (9th Cir.1996). "What less egregious condition or combination of conditions or factors would meet the test requires case by case, fact by fact consideration." Keenan, 83 F.3d at 1089.  Applying these standards, the Supreme Court concluded that prisoners have no liberty interest in remaining in the general population.  See Id. at 485-86.  The Supreme Court has also concluded that prisoners have no liberty interest in freedom from intrastate prison transfers or in staying at a particular institution, see Meachum v. Fano, 427 U.S. 215, 224-225, 96 S.Ct. 2532 (1976), or in not losing privileges, see Baxter v. Palmigiano, 425 U.S. 308, 323, 96 S.Ct. 1551 (1976).

///

1    Where a protectable liberty interest exists, the Supreme Court has set out the following

2  procedural due process requirements for disciplinary detention of a prisoner: (1) written notice of

3  the charges; (2) at least 24 hours between the time the prisoner receives written notice and the

4  time of the hearing, so that the prisoner may prepare his defense; (3) a written statement by the

5  fact finders of the evidence they rely on and reasons for taking disciplinary action; (4) the right of

6  the prisoner to call witnesses in his defense, when permitting him to do so would not be unduly

7  hazardous to institutional safety or correctional goals; (5) legal assistance to the prisoner where

8  the prisoner is illiterate or the issues presented are legally complex.  Wolff, 418 U.S. at 556.

9                    **a.    Defendant Reece's Position**

10    Defendant Reece argues that Plaintiff fails to state a due process claim because he has not

11  established any protected liberty interest.

12    First, Reece argues that Plaintiff's transfer to CCI, which Plaintiff alleges was a result of

13  Reece's failure to schedule a classification hearing, does not amount to a due process violation

14  because Plaintiff did not have a protected liberty interest in remaining at CMC, because prisoners

15  have no liberty interest in avoiding being transferred to another prison.

16    Second, Reece argues that the time Plaintiff spent in the SHU at CCI awaiting a

17  classification hearing did not violate Plaintiff's rights to due process, because nine days in the

18  SHU do not amount to a liberty interest "of real substance" under Sandin.  Defendants present the

19  following evidence.  There is no dispute that Reece played no role in Plaintiff being found guilty

20  of "possession of a weapon," being approved for transfer to CCI, or having his offense reduced to

21  possession of materials that could be made into a weapon.   (Doc. 1; UF 6, 7, 13-17.)  Thus, this

22  case does not concern any conduct before May 15, 2002, when Plaintiff began requesting Reece to

23  schedule a classification committee hearing to address his reduced offense.  Plaintiff claims that,

24  after his sentence was reduced at CMC, he attempted to advise Reece that he was no longer

25  eligible for a SHU term at CCI, but Reece did not schedule a classification committee hearing

26  between May 15 and June 4, 2002.  Plaintiff did not begin serving his SHU term until June 5,

27  2002, and Plaintiff was provided a classification hearing on June 13, 2003.  (UF 2, 3, 8, 11, 12,

28  22, 23.)  Therefore, Reece concludes that Plaintiff's claim rests on the allegation that Reece caused

1   him to serve nine days, from June 5, 2002 to June 13, 2002, in the SHU at CCI before a

2   classification committee assessed his SHU status.

3          The court finds that Defendant Reece has met his initial burden of informing the court of

4   the basis for his motion, and identifying those portions of the record which he believes

5   demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to

6   plaintiff to establish that a genuine issue as to any material fact actually does exist.  See

7   Matsushita, 475 U.S. at 586.  As stated above, in attempting to establish the existence of this

8   factual dispute, plaintiff may not rely upon the mere allegations or denials of his pleadings, but is

9   required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

10  material, in support of its contention that the dispute exists.  Fed.R.Civ.P. 56(e); Matsushita, 475

11  U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong, 474 F.2d at 749.

12              **3.      Plaintiff's Opposition**

13         In opposition, Plaintiff argues that his allegations state a prima facie due process claim, as

14  follows.  On April 6, 2002, when Plaintiff was incarcerated at CMC, he was found guilty of a

15  CDC-115 Rules Violation and sentenced to a SHU term, based on false information.  (UF 8; ACP,

16  Doc 22 at 3;Opp'n, Doc. 92 at 2.)  Plaintiff appealed the decision and on May 15, 2002, the appeal

17  was granted and the Rules Violation was reduced to a lesser offense, making him ineligible for the

18  SHU term.  (UF 15-21; ACP, Doc 22 at 3;Opp'n, Doc. 92 at 2.)  Plaintiff wrote three times to his

19  counselor, C. Reece, to be reclassified to reflect the lesser offense, providing Reece with a copy of

20  the CDC-128G form he received on May 16, 2002.  (UF 25; ACP, Doc 22 at 3;Opp'n, Doc. 92 at

21  2.)  Reece ignored his request.  (ACP, Doc 22 at 3.)  Plaintiff contends that without his

22  counselor's authorization, the reclassification hearing would not be held, and Plaintiff would be

23  forced to serve the SHU term.  Id.  On June 5, 2002, Plaintiff was transferred to the SHU at CCI.

24  (UF 16-17; ACP, Doc 22 at 3; Opp'n, Doc. 92 at 3.)  At CCI, Plaintiff was advised there was no

25  evidence in his Central file proving an appeal was granted, and he was forced to serve a 105-day

26  term in the SHU. (Opp'n, Doc. 92 at 3.)  As evidence supporting his due process claim, Plaintiff

27  submits a copy of an order by Kern County Superior Court Judge Robert S. Tafoya, issued on

28  May 22, 2003 in a habeas corpus action based on the above allegations, deciding that Plaintiff

1  "states a prima facie case for relief" because he was punished more severely than he should have

2  been when he served a SHU term for a Division C offense.  (Opp'n, Doc. 92 at 8, Exh. C.)

3       Defendants respond that Plaintiff's opposition does not dispute any of the undisputed facts

4  supporting Defendants' motion.

5            **4.   <u>Discussion</u>**

6       The court finds that Plaintiff has not met his burden of establishing the existence of a

7  genuine issue of any material fact.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 586.  Even assuming that

8  Plaintiff's allegations are true, the allegation that Reece's failure to schedule a classification

9  hearing resulted in less favorable prison conditions for Plaintiff, alone, does not establish the

10 existence of any liberty interest entitling Plaintiff to procedural due process protections.

11 Plaintiff's transfer to CCI and 105 days spent in the SHU, without more, do not constitute ". . .

12 atypical and significant hardship . . . in relation to the ordinary incidents of prison life." <u>Sandin</u>

13 515 U.S. at 484; <u>see also</u> <u>May v. Baldwin</u>, 109 F.3d 557, 565 (9th Cir. 1997) (convicted inmate's

14 due process claim fails because he has no liberty interest in freedom from state action taken within

15 sentence imposed and administrative segregation falls within the terms of confinement ordinarily

16 contemplated by a sentence) (quotations omitted); <u>Resnick</u>, 213 F.3d at 447 (plaintiff's placement

17 and retention in the SHU was within range of confinement normally expected by inmates in

18 relation to ordinary incidents of prison life and, therefore, plaintiff had no protected liberty interest

19 in being free from confinement in the SHU) (quotations omitted).

20       In <u>Jackson v. Carey</u>, a state prisoner filed a § 1983 action against prison officials alleging

21 he was transferred to the SHU from administrative segregation after he had successfully appealed

22 the outcome of the disciplinary hearing which placed him in administrative segregation and called

23 for his placement in the SHU.  <u>Jackson v. Carey</u>, 353 F.3d 750 (9th Cir. 2003).  The district court

24 dismissed Jackson's complaint for failure to state a claim.  <u>Id.</u>  On appeal, the Ninth Circuit

25 reversed in part and remanded.  <u>Id.</u>  The Ninth Circuit held that Jackson presented a due process

26 claim under <u>Sandin</u>, because Jackson demonstrated that there were material differences in living

27 conditions between the prison's three custody levels and that placement in the security housing

28 ///

1  unit constituted an "atypical and significant hardship in relation to the ordinary incidents of prison

2  life." Id.

3      In the present case, Plaintiff has not alleged any facts demonstrating that the conditions of

4  his confinement in the SHU at CCI were "the type of atypical, significant deprivation [that] might

5  conceivably create a liberty interest." Sandin 515 U.S. at 486; Resnick, 213 F.3d at 448.  Plaintiff

6  has not offered any evidence that the conditions differed materially, or that serving the SHU term

7  at CCI created a major disruption in his environment, when compared to the conditions during his

8  confinement at CMC.  See Jackson, 353 F.3d at 755-756; also see Resnick, 213 F.3d at 448.  It is

9  undisputed that CMC does not have a SHU and that CCI does, but Plaintiff does not describe the

10  difference.  (UF 13, 14.)  Plaintiff alleges his placement at CMC was on a Level IV yard, but he

11  does not describe the conditions there.  (ACP at 3.)  The Superior Court order submitted as

12  evidence by Plaintiff, which determined that Plaintiff  "state[d] a prima facie case for relief" in a

13  habeas corpus action because he was punished more severely than he should have been when he

14  served a SHU term for a Division C offense, does not provide evidence of the conditions in the

15  SHU.  Accordingly, the court finds that defendant Reece is entitled to judgment as a matter of law

16  on Plaintiff's procedural due process claims against him, and the court recommends that

17  defendant Reece be granted summary adjudication as to these claims.

18              **2.    Partial Summary Judgment**

19      Defendant Reece also argues he is entitled to partial summary judgment on the ground that

20  he did not cause Plaintiff's injuries after June 13, 2002.  Because the court finds that Plaintiff fails

21  to establish the existence of a protected liberty interest, the issue of causation need not be

22  addressed.

23  **VI.  CONCLUSION AND RECOMMENDATION**

24      The court concludes that Defendants are entitled to judgment as a matter of law because

25  Plaintiff has not raised any triable issues of material fact as to his due process claim against C.

26  Reece or his Eighth Amendment medical care claim against Defendant Dr. J. Baughman.

27  Accordingly, the court RECOMMENDS that the motion for summary judgment be GRANTED

28  and judgment be entered in favor of Defendants.

1    These Findings and Recommendations will be submitted to the United States District

2 Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

3 **thirty (30) days** after being served with these Findings and Recommendations, the parties may

4 file written objections with the court.  The document should be captioned "Objections to

5 Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

6 objections within the specified time may waive the right to appeal the district court's order.

7 <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

8

9    IT IS SO ORDERED.

10   **Dated:    May 6, 2010**                    **/s/ Gary S. Austin**

11                                        UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28